IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

THE PARADIES SHOPS, INC.,

        Plaintiff(s),

v.

HARTFORD FIRE INSURANCE
COMPANY

        Defendant(s).

CIVIL ACTION NO.

1:03-CV-3154-JEC

## O R D E R

This case is presently before the Court on plaintiff's Motion for Summary Judgment [36] AND defendant's Motion for Summary Judgment [37]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that plaintiff's Motion for Summary Judgment [36] should be **DENIED** AND defendant's Motion for Summary Judgment [37] should be **GRANTED**.

## BACKGROUND

Plaintiff and defendant have filed cross-motions for summary judgment. The Court draws the facts of this case from The Paradies Shops, Inc.'s Statement of Material Facts as to Which There is No Genuine Issue To Be Tried ("PSMF") [36], Defendant's Response to Plaintiff's Statement of Material Facts as to Which There is No

AO 72A
(Rev.8/82)

Genuine Issue To Be Tried ("DRPSMF") [42], Defendant's Statement of Material Facts as to Which There is No Genuine Dispute ("DSMF") [37], and The Paradies Shops, Inc.'s Response to Defendant's Statement of Material Facts as to Which There is No Genuine Dispute ("PRDSMF") [39].

## I.   Factual Background

Plaintiff, Paradies Shops, Inc., operates gift shops, newsstands, and retail stores located in airport terminals around the country.  (DSMF at ¶ 1.)  In July 2001, Plaintiff purchased an insurance policy from defendant, Hartford Fire Insurance Company. The policy insured plaintiff's retail stores at sixty-two locations around the country from July 1, 2001 through July 1, 2002.  (*Id.* at ¶ 2-3, PSMF at ¶ 5 (citing Special Multi-Flex Policy From the Hartford ("Policy") at Bates No. TPS 000003).)

### A.   The Policy

In addition to more standard insurance coverage, the Policy provided business interruption insurance pursuant to the terms of a "Special Business Income Coverage Form."  (DSMF at ¶ 5.)   The Policy states:

> A. COVERAGE
>
> > We will pay up to the **Business Income Limit of Insurance** stated in the Declarations for the actual loss of Business Income you sustain and actual and necessary Extra Expense you incur due to direct physical loss of or damage

2

caused by or resulting from a Covered Cause of Loss to:

i. Property at premises where you normally conduct business operations, including those you acquire after the inception of this insurance;

ii. Property at the premises of others who process or store your "Stock", other than any vendor providing you with "Web Site and Communications Services";

iii. Your property at, and in transit to and from fairs, exhibitions, or trade shows; or

iv. Your property in the custody of authorized sales representatives and other company business travelers.

(DSMF at ¶ 6 (citing Policy at Bates No. TPS 000177).)

The business interruption policy also contained "Civil Authority" coverage. This Civil Authority coverage is the heart of the parties' current dispute. The Civil Authority provision provides:

a. Civil Authority

Coverage: This insurance is extended to apply to Business Income and Extra Expense loss when access to insured premises is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property away from your premises. This coverage will apply up to 30 consecutive days from the date of the civil action.

Limit of Insurance: This coverage is included within the Business Income Limit of Insurance.

3

(PSMF at ¶ 6 (referencing Policy at Bates No. TPS 000178).)

The Policy defines "Covered Cause of Loss" as used in the Civil Authority provision to mean:

> Covered Causes of Loss, means loss caused by direct physical loss or damage to Covered Property within the policy period stated on the Common Policy Declarations:
>
> > i. Unless the loss is excluded in the General Exclusion or the Specific Exclusions; or
> >
> > ii. Unless the loss is excluded or limited within the provisions for specific coverages or types of property; and
> >
> > iii. Subject to the Limits of Insurance and Deductibles stated in the Declarations or stated in the Coverages.

(Policy at Bates No. TPS 000195.)

### B.   The Events of September 11, 2001

On the morning of September 11, 2001, during the time period in which the Policy was in effect, terrorists hijacked four commercial airlines departing from Boston Logan, Washington Dulles, and Newark airports.  At 8:46 A.M. EDT, one of the four hijacked aircraft crashed into the north tower of the World Trade Center in New York, New York.  Approximately sixteen minutes later, at 9:02 A.M. EDT, a second aircraft crashed into the south tower of the World Trade Center.  (DSMF at ¶ 8 (citing FAA Fact Sheet entitled "Chronology of Events on September 11, 2001").)  By 9:26 A.M. EDT, the Federal Aviation Administration ("FAA") had banned all civilian

AO 72A
(Rev.8/82)

aircraft from takeoffs with a national order ("Order One") stating, "[d]ue to national emergency, ground stop all departures regardless of destination . . . repeat ground stop all departures." (DSMF at ¶ 8.) Less than fifteen minutes later, the third aircraft crashed into the Pentagon. (DSMF at ¶ 8 (citing FAA Fact Sheet entitled "Chronology of Events on September 11, 2001").) At 9:45 A.M. EDT the FAA issued a second nationwide order ("Order Two") providing:

> Due to extraordinary [sic] circumstances and for reasons of safety. Attention all aircraft operators, by order of the Federal Aviation Command Center, all airports/airdromes are not authorized for landing and takeoff. All traffic including airborne aircraft are encouraged to land shortly.

(PSMF at ¶ 10.)

Finally, at 10:07 A.M. EDT the last of the four hijacked aircraft crashed into a field in Stony Creek Township, Pennsylvania. (DSMF at ¶ 8 (citing FAA Fact Sheet entitled "Chronology of Events on September 11, 2001").) By approximately 12:15 P.M., the airspace over the forty-eight contiguous states was clear of all commercial and private flights. (Id.) The national ground stop remained in effect until September 13, 2001. (PSMF at ¶ 11.)

Later, in a statement before the Senate Committee on Commerce, Science, and Transportation in summarizing the Department of Transportation's response to September 11th, Secretary of

5

Transportation Norman Y. Mineta indicated that he had personally ordered the ground stop, "as soon as I was aware of the nature and scale of the attack." Secretary Mineta went on to testify that, though it was an "unprecedented step" to order all aircraft to land, "with the risk of additional flights that might be used as terrorist weapons, I believe that it was the right and necessary step to take." (DSMF at ¶ 9-10 (citing *Statement of Norman Y. Mineta, Secretary of Transportation, Before the Senate Commerce, Science and Transportation Committee, 107th Congress, 1st Session, September 20, 2001,* p. 1 at Bates No. TPS 000919).) Plaintiff interprets Secretary Mineta's statements to mean that the decision to order the national ground stop was based in part on the fear of additional terrorist attacks and in part on the terrorist attacks that had already occurred. (PRDSMF at ¶ 10.) In contrast, defendant maintains that Secretary Mineta's orders were based solely on the fear that additional airlines may be hijacked and used as terrorist weapons. (DSMF at ¶ 10.)

Ultimately, plaintiff believes that, "as a result of" the FAA orders, access to all of plaintiff's airport shops was "prohibited" because "there was no reason for the traveling public to go to the airport, and the public was discouraged from doing so." (PSMF at ¶ 12.) Plaintiff also maintains that, as a further result of the FAA orders, the traveling public was specifically denied access to

6

post-security screening areas of all of the nation's airports and plaintiff's shops located therein. (*Id.* at ¶ 13.)  According to plaintiff, plaintiff's stores were closed from September 11, 2001 through September 13, 2001 because individual airport authorities around the nation specifically informed plaintiff's General Managers that the airports would be closed. (PSMF at ¶ 15.)  In an effort to recover the loss in business income that resulted from the September 11th shutdown, plaintiff filed what they believed to be a proper and timely claim under the Civil Authority Provision of the Policy for shops located in fifty-one airports sometime after September 11th.[1]  (PSMF at ¶ 18, DSMF at ¶ 17.)

In contrast, defendant maintains that nothing in either of the FAA orders closed operations at all airports or specifically prohibited access to any of plaintiff's stores.  (DRPSMF at ¶ 10.)  After receiving a "Property Loss Notice" from plaintiff, defendant claims to have spent more than fifty hours contacting the FAA, conducting research on airport Internet websites, and interviewing airport authorities by telephone to obtain clarification on Order

---

[1]  Evidently, plaintiff is unsure of when the insurance claim was filed.  To establish the date their claim was filed plaintiff relies on the deposition testimony of Don Marek, plaintiff's Vice President of Finance, who states "we filed the claim pretty much on September 12th or 13th."  (PSMF at ¶ 18 (citing Dep. of Don Marek p. 224).)  Regardless, defendant admits  receiving a "Property Loss Notice" from plaintiff's insurance broker dated September 13, 2001. (DSMF at ¶ 15.)

AO 72A
(Rev.8/82)

Two and to ascertain whether any airport, or a part thereof, had been closed by civil authorities on or after September 11, 2001. (DSMF at ¶ 18.)   Despite defendant's contention that no civil authority specifically prohibited access to any of plaintiff's stores, the adjuster who conducted the bulk of defendant's airport closure investigation determined that, at least at some airports, terminals were open but gate access was denied.   (DRPSMF at ¶ 10, Dep. of Kimberley Stephens at pp. 27, 47.)

On January 29, 2002, defendant denied coverage for plaintiff's business interruption claim.   In the denial letter defendant states:

> We have carefully researched the circumstances surrounding your claim.  The order of the FAA, closing the airspace, and subsequent orders by various airport authorities were not directly due to the existing physical damage already sustained at the World Trade Center, The Pentagon or the airline crash site in Pennsylvania.  Rather, it appears that the orders were issued in response to general concerns regarding prevention of additional terrorist activities following the devastation at the World Trade Center and other locations on September 11, 2001. . . As you sustained no direct physical damage to property at the described premises, nor was there an order of Civil Authority prohibiting access to your premises <u>as the direct result</u> of a Covered Cause of Loss the [Special Business Income Coverage] provisions of your policy will not provide coverage for your loss.

(The Paradies Shops, Inc.'s Resp. Br. in Opp'n to Def.'s Mot. for Summ. J. [38] ("Pl.'s Resp.") at Ex. D.)

## II.  Procedural History

After plaintiff's claim was denied, plaintiff filed an action in the state court of Fulton County, Georgia seeking resolution of the dispute claiming breach of contract and bad faith, in violation of O.C.G.A. § 33-4-6 (2003).  Defendant timely removed the action to this Court pursuant to 28 U.S.C. §§ 1441(a) and 28 U.S.C. § 1446 on the basis of diversity jurisdiction under 28 U.S.C. § 1332. (Notice of Removal [1].)

### DISCUSSION

## I.  Summary Judgment Standard

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c)).

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits.   Instead, Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of every element essential to that party's case on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In such a situation, there can be no

AO 72A
(Rev.8/82)

genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Id.* at 322-23.

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323; *Apcoa, Inc. v. Fidelity Nat'l Bank*, 906 F.2d 610, 611 (11th Cir. 1990). The movant is not required to negate his opponent's claim, however. The movant may discharge his burden by merely "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. After the movant has carried his burden, the nonmoving party is then required to "go beyond the pleadings" and present competent evidence[2] designating "'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting FED. R. CIV. P. 56(e)). While the court is to view all evidence and factual inferences in a light most favorable to the nonmoving party, *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1236 (11th Cir. 2003), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of

---

[2] The nonmoving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like. *Celotex*, 477 U.S. at 324.

10

*material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

A fact is material when it is identified as such by the controlling substantive law. *Id.* at 248. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249-50. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations omitted). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson,* 477 U.S. at 249-50. Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of *every* element material to that party's case so as to create a genuine issue for trial.

## II. Defendant's Motion for Summary Judgment

Defendant moves for summary judgment on the basis that plaintiff cannot prove that it sustained a loss falling within the terms of the Civil Authority provision of the Policy's business

AO 72A
(Rev.8/82)

interruption coverage.[3] (Mem. in Supp. of Def.'s Mot. for Summ. J. [37] ("Def.'s Br.") at 2.) More specifically, defendant argues that the Policy does not cover plaintiff's loss because: (a) no order of civil authority relied upon by plaintiff was issued as the "direct result" of property damage by a covered peril away from its premises; and (b) no order of civil authority, by the FAA or any other, "specifically prohibited access" to any airport or store covered by the Policy. (Def.'s Br. at 2.) Indeed, based on the language of the Policy, in order for plaintiff to recover plaintiff must be able to establish both, that an order of civil authority was issued as the "direct result" of property damage by a covered peril away from its premises, and that an order of civil authority "specifically prohibited" access to plaintiff's premises.

### A.   Breach of Contract Claim

In Georgia, "[a]s is the case with all contracts, unambiguous terms of an insurance policy require no construction, and the plain meaning of such terms must be given full effect, regardless of whether they might be beneficial to the insurer or detrimental to the insured." *Cont'l Cas. Co. v. H.S.I. Fin. Servs. Inc.*, 266 Ga. 260, 262, 466 S.E.2d 4, 6 (1996). However, "insurance contracts

---

[3] Because plaintiff did not sustain any direct physical loss or damage to any of its stores, the Civil Authority provision provides the only possibility of coverage for plaintiff's loss under the Policy.

12

are contracts of adhesion, and when ambiguity is present, construction of the policy is in favor of the insured insofar as that construction is reasonable and unstrained." *Lemieux v. Blue Cross & Blue Shield of Georgia*, 216 Ga. App. 230, 231, 453 S.E.2d 749, 751 (1994). Indeed, where an insurance contract is ambiguous or open to interpretation, "the ordinary and legal meaning of the words used must be taken into consideration." *Id.* at 231, 751. In an insurance contract, ambiguity is, "duplicity, indistinctiveness, uncertainty of meaning of expression, and words or phrases which cause uncertainty of meaning and may be fairly construed in more than one way." *Georgia Farm Bureau Mut. Ins. Co. v. Meyers*, 249 Ga. App. 322, 324, 548 S.E.2d 67, 69 (2001). In the case of such ambiguity, "[a]n insurance policy is construed liberally to provide coverage and avoid forfeitures, so when a provision is susceptible to two constructions a court must adopt the one most favorable to the insured." *Lemieux,* 216 Ga. App. at 231, 453 S.E.2d at 751. The test in construing an insurance policy is what a reasonable person in the position of insured would understand the words to mean, not what the insurer intended its words to mean. *Auto-Owners Ins. Co. v. Barnes*, 188 Ga. App. 439, 441, 373 S.E.2d 217, 219 (1988). Still, in the end, the burden of proof is on the plaintiff to prove that they have sustained a loss under the applicable insurance policy and to prove the amount of such loss. *Reserve*

13

*Life Ins. Co. v. Davis*, 224 Ga. 665, 667, 164 S.E.2d 132, 133 (1968).

**B.   No Order of Civil Authority Was Issued as a Direct Result of a Covered Cause of Loss**

The Civil Authority provision under which plaintiff seeks to recover pays for lost business income sustained, "when access to insured premises is <u>specifically prohibited</u> by order of a civil authority as the <u>direct result</u> of a Covered Cause of Loss to property away from your premises." (Policy at Bates No. TPS 000178 (emphasis added).)  For purposes of the Civil Authority provision, a Covered Cause of Loss means a direct physical loss or damage that (1) occurs within the policy period,  (2) from a peril that is not otherwise excluded or limited elsewhere in the Policy.  (Def.'s Br. at 12 (citing Policy at Bates No. TPS 000195).)  In this case, the Covered Cause of Loss to property away from plaintiff's premises that comprises the basis of plaintiff's claim is the physical loss and damage to the World Trade Center, The Pentagon, and the field in Stony Creek Township, Pennsylvania, caused by airplanes hijacked on September 11, 2001.  Therefore, to satisfy the direct result provision of the Policy, plaintiff must be able to establish  that some order of civil authority was issued as the direct result  of the physical damage sustained by the World Trade Center, The

14

Pentagon, or the field in Stony Creek Township, Pennsylvania.  This plaintiff cannot do.

Though its precedent does not bind this Court, in *City of Chicago v. Factory Mut. Ins. Co.*, No. 02 C 7023, 2004 WL 549447 (N.D. Ill. March 18, 2004), the United States District Court for the Northern District of Illinois denied the City of Chicago's business interruption insurance claim for losses sustained by the city's airports as a result of the September 11th ground stop order contained in Order Two.  In denying the claim for coverage, the *City of Chicago* court concluded that though Order Two was "indirectly caused by terrorist-inflicted damage," ultimately "the ground stop was . . .  imposed to protect against any *further* terrorist attacks."  *Id.* at *3-4.

Other courts interpreting the term "direct result" as used in a business interruption insurance policy have similarly rejected coverage for losses sustained as a result of civil authority orders that were designed to prevent future damage rather than address existing property damage.  *Syufy Enters. v. Home Ins. Co. of Indiana*, No. 94-0756 FMS, 1995 WL 129229, at *2 (N.D. Cal. March 21, 1995) (rejecting plaintiff's claim for business interruption coverage for losses sustained during curfews imposed after the Rodney King verdict where policy required that access to plaintiff's premises be specifically prohibited by order of civil

15

authority and a direct result of damage to or destruction of property adjacent to the premises because curfews were imposed to prevent potential looting and rioting, not as a result of adjacent property damage).

Here in Georgia, in *Assurance Co. of America v. BBB Serv. Co., Inc.*, 259 Ga. App. 54, 576 S.E.2d 38 (2002), appeal after remand, *Assurance Co. of America v. BBB Serv. Co., Inc.*, 265 Ga. App. 35, 593 S.E.2d 7 (2003), in a claim unrelated to the events of September 11th, the Court of Appeals of Georgia resolved a dispute over civil authority coverage designed to pay for plaintiff's actual loss of business income "caused by action of civil authority that prohibits access to [plaintiff's] premises due to direct physical loss of or damage to property, other than at the 'covered premises'." *Id.* at 54, 39. In reversing the trial court's grant of summary judgment for the insured, the *Assurance* court noted that if the hurricane evacuation order at issue in the case was issued due to the threat of future injury to persons and property and not because of any already existing physical loss or damage to property, plaintiff would be barred from recovery. *Id.* at 56, 41.

In this case, because Secretary Mineta specifically stated that he issued Order Two "with the risk of additional flights that might be used as terrorist weapons," the Court concludes that the ground stop order was issued as a result of the threat of

16

additional terrorist acts involving the nation's airlines and not because of the existing disasters at the World Trade Center, the Pentagon, or Stony Creek Township, Pennsylvania. Thus, like the *City of Chicago* court, this Court concludes that, though Order Two was in part a product of the terrorist-inflicted damage already in existence at the time the order was issued, the ground stop was ultimately imposed to protect against any further terrorist attacks. As in *Syufy Enters.* and *Assurance Co. of America*, the Court finds that an order like Order Two that is designed to prevent, protect against, or avoid future damage is not a "direct result" of already existing property loss or damage.

The Court also concludes that the term "direct result," as used in the Policy, is unambiguous. This conclusion requires the Court to give full effect to the plain meaning of the term "direct result", regardless of whether this is beneficial to the insurer or detrimental to the insured. *See Cont'l Cas. Co.*, 266 Ga. at 262, 466 S.E.2d at 6. Therefore, construing all evidence and factual inferences in the light most favorable to the plaintiff, the Court finds that plaintiff is unable to establish that any order of civil authority was issued as the "direct result" of the attacks on the World Trade Center, the Pentagon, or Stony Creek Township, Pennsylvania. Because the Civil Authority provision of the Policy reimburses lost business income only "when access to insured

17

premises is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property away from your premises," plaintiff fails to meet an essential element of their case.

### C.   Access to Insured's Premises Was Not Specifically Prohibited by Order of a Civil Authority

Even if plaintiff could establish that an order of civil authority was issued as the direct result of the damage or loss of property at the World Trade Center, the Pentagon, or Stony Creek Township, Pennsylvania, in order to prevail on its breach of contract claim, plaintiff must be able to establish that some order of civil authority "specifically prohibited" access to plaintiff's premises.   Plaintiff argues that because Order Two grounded all flights "there was no reason for the traveling public to go to the airport, and the public was discouraged from doing so," and that this discouragement is tantamount to access to plaintiff's premises being "specifically prohibited." (PSMF at ¶ 12.)   In order to make this argument, plaintiff attempts to lead this Court through a series of online dictionary definitions.[4]   In doing so plaintiff

---

[4]   Merriam-Webster's online dictionary lists the following definitions for the term "prohibit":
1: to forbid by authority or command
2: to prevent from doing or accomplishing something: effectively stop
(www.merriamwebster.com (last visited September 8, 2004))
Plaintiff relies on the second of these two definitions while

18

neglects to site the first definition listed by plaintiff's own source which defines prohibit to mean "to forbid by authority or command." The Court finds this first definition to be the plain meaning of the unambiguous term "prohibit". Indeed, the Court sees no reasonable means of construing Secretary Mineta's order to ground all aircraft as an order specifically forbidding access to plaintiff's premises. The Court notes that at least three other federal district courts who have considered claims for insurance coverage for losses sustained as a result of September 11th have held that the term "prohibit" is unambiguous.[5]

---

ignoring the first to argue that, because prohibit may be defined to mean "to prevent from doing or accomplishing something," and because prevent may be defined to mean "to deprive of power or hope of acting or succeeding...to hold or keep back...to hinder," orders of civil authority prohibited the traveling public from going to plaintiff's airport shops. (Pl.'s Resp. at 5.) The Court rejects this argument.

[5] In *Abner, Herrman & Brock, Inc. v. Great N. Ins. Co.*, 308 F. Supp. 2d 331 (S.D.N.Y. 2004), the Civil Authority provision at issue provided that the insurer would pay "for actual business income loss you incur . . . when a civil authority prohibits access to your premises." *Id.* at 334. Concluding that policy language requiring a civil authority to "prohibit access" in order for coverage to attach was unambiguous, the *Abner* court granted insured recovery only for losses sustained during the period of time in which civil authorities actually prohibited access to insured's business premises located in lower Manhattan. At the same time, the *Abner* court denied recovery for losses sustained during the time period in which employees were confused about access to the premises and upper management had difficulty getting into and out of the area because during this time access was not prohibited. *Id.* at 336.

The United States District Court for the Western District of

19

Plaintiff also argues that access to plaintiff's premises was prohibited by order of individual airport authorities at each of the airports where plaintiff operates its stores.  To support this argument, plaintiff has filed declarations from forty-two of its general managers.  These declarations contain nearly identical language stating, among other things: (1) on September 11, 2001, the general manager was informed by unnamed airport management that the airport was closed; (2) in response to this notice from unnamed airport management the general manager closed the airport locations under his management; and (3) the traveling public was denied access to post-security areas of the airport and any of plaintiff's stores located therein.  (The Paradies Shops, Inc.'s Br. in Supp.

---

Oklahoma has also concluded that the term "prohibit", as used in contract language requiring an "action of civil authority that prohibits access to the described premises," is unambiguous. *Southern Hospitality, Inc. v. Zurich American Ins.*, No. Civ.02-923-C, 2003 WL 23416117, at *2, 4 (W.D. Okla. Sept. 30, 2003).

Finally, in *730 Bienville Partners, Ltd. v. Assurance Co. of America*, No. Civ.A.02-106, 2002 WL 31996014, at *2 (E.D. La. Sept. 30, 2002), the United States District Court for the Eastern District of Louisiana denied a hotel's claim for coverage under the Civil Authority provision of the hotel's insurance policy because the policy was unambiguous in its requirement that a civil authority actually prohibit access to insured's hotels.  Finding for the defendant insurer, the *Bienville* court noted that though the FAA's cancellation of flights may have prevented guests from getting to plaintiff's hotels, the FAA did not "prohibit" access to the hotels.  *Id.*  In doing so, the *Bienville* court adopted "to forbid by authority or command" as the definition of prohibit.  *Id.*

of Mot. for Summ. J. [36] ("Pl.'s Br.") at Ex. 8.)   Defendant
objects to these declarations as hearsay offered to prove that each
airport was, in fact, closed on September 11th.  (Def.'s Notice of
Objection to Evidence Contained in Decls. of Pl.'s General
Managers, With Supporting Mem. [41] at 16.)  Plaintiff insists that
these declarations are not offered to prove whether the airports
were actually closed, but rather to demonstrate that plaintiff's
general managers were informed that the airports were closed and to
reveal the effect such statements had upon the general managers
with regard to closure of plaintiff's shops.  (Pl.'s Resp. at 11-
12.)

Unless the airports were actually closed by some civil
authority, access to plaintiff's premises was not specifically
prohibited and coverage does not attach.  Therefore, the Court
finds that the general managers' declarations are inadmissible
hearsay offered to prove that each airport was, in fact, closed by
airport authorities.  Because inadmissible hearsay cannot be
considered on a motion for summary judgment, *Macuba v. Deboer*, 193
F.3d 1316, 1322 (11th Cir. 1999) (Tjoflat, J.), the declarations
offered by plaintiff fail to establish that an order of civil
authority "specifically prohibited" access to plaintiff's premises.
In deposition testimony, defendant's own adjuster stated that, at
least at "some airports", terminals were open but gate access was

denied.   (Dep. of Kimberley Stephens at p. 47.)  As to those "some airports" where gate access was denied, the Court would be willing to consider the possibility that access to plaintiff's stores located therein was "specifically prohibited" but, unfortunately, plaintiff has failed to offer any evidence of which stores were located in gate areas at airports where gate access was "forbid by authority or command."  Therefore, viewing all evidence and factual inferences in a light most favorable to the plaintiff, the Court concludes that plaintiff has failed to prove that an order of civil authority "specifically prohibited" access to plaintiff's premises, an essential element of plaintiff's case.

The Civil Authority provision, under which plaintiff seeks to recover, pays for lost business income only "when access to insured premises is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property away from your premises."  (Policy at Bates No. TPS 000178 (emphasis added).)  Plaintiff has failed to establish that any order of civil authority was issued as the direct result of the physical loss at the World Trade Center, the Pentagon, or Stony Creek Township, Pennsylvania.  Plaintiff has also failed to establish that access to any of plaintiff's premises was specifically prohibited.  Having failed to satisfy the requirements of the Policy, plaintiff is not entitled to any recovery.   Accordingly, the Court **GRANTS**

22

defendant's motion for summary judgment on plaintiff's claim for breach of contract.

### D.   Bad Faith Under O.C.G.A. § 33-4-6

Section 33-4-6 of the Georgia Code provides recovery for the insured where the insurer refuses to pay a covered loss in bad faith.   The insured bears the burden of proving that insurer's refusal to pay the claim was made in bad faith.   *Allstate Ins. Co. v. Smith*, 266 Ga. App. 411, 413, 597 S.E.2d 500, 502 (2004) (citing *Southern Fire & Cas. Ins. Co. v. Northwest Ga. Bank*, 209 Ga. App. 867, 434 S.E.2d 729 (1993)).   However, "[p]enalties for bad faith are not authorized where the insurance company has any reasonable ground to contest the claim and where there is a disputed question of fact."   *Id.*

In this case plaintiff's losses were not covered under the terms of the Policy.   Even if plaintiff's losses had been covered under the terms of the Policy, the Court finds nothing in defendant's investigation or response to plaintiff's claim to indicate defendant's refusal was made in bad faith.   Indeed, defendant insurance company had reasonable grounds to contest plaintiff's claim.   Therefore, the Court **GRANTS** defendant's motion for summary judgment as to plaintiff's claim for bad faith under O.C.G.A. ¶ 33-4-6.

23

### III.  Plaintiff's Motion for Summary Judgment

The Court has determined that defendants are entitled to summary judgment on all claims asserted by plaintiff.  Accordingly, the Court **DENIES** plaintiff's motion for summary judgment.

### CONCLUSION

For the foregoing reasons, the Court **DENIES** plaintiff's Motion for Summary Judgment [36] AND **GRANTS** defendant's Motion for Summary Judgment [37].

SO ORDERED, this _15_ day of December, 2004.

_____
JULIE E.  CARNES
UNITED STATES DISTRICT JUDGE

24

AO 72A
(Rev.8/82)